# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

## CASE NO. 16-23658-CIV-GOODMAN
## [CONSENT CASE]

DAVID CARIDEO,

     Plaintiff,

v.

WHET TRAVEL, INC., et. al.,

     Defendants.

_____/

## ORDER ON DEFENDANT CARNIVAL CORPORATION'S
## *DAUBERT* MOTION TO STRIKE PLAINTIFF'S EXPERT WITNESSES
## AND ALL OTHER "NON-RETAINED" EXPERTS

*"Daubertizing"*[1] is an informal term lawyers sometimes use when referring to efforts designed to challenge (and ultimately exclude) the other side from offering expert witness opinion testimony at trial (or in connection with a summary judgment motion). In the Southern District of Florida, *Daubertizing* is an often-invoked tactic. In some cases, <u>both</u> sides engage in *Daubertizing.* Sometimes, the *Daubertizing* creates more motion practice (with comprehensive memoranda) than a summary judgment motion.[2]

---

[1] *See, e.g.,* John Daab, *Daubertizing the Art Expert,* 7 J. OF ART CRIME 21 (2012); Thomas O. McGarity, *On the Prospect of "Daubertizing" Judicial Review of Risk Assessment,* 66 L.& Contemp. Probs. 155-226 (2003).

[2] *See, e.g., Companhia Energetica Potiguar v. Caterpillar, Inc.,* Case No. 14-24277 (S.D. Fla. 2007) [ECF Nos. 401; 412] (90-page Omnibus Report and Recommendations

And in many cases, including this one, a party seeks to *Daubertize* **all** of the opponent's experts.

In this negligent security lawsuit in which a passenger aboard an alcohol-dispensing "Groove Cruise" was attacked and beaten by two fellow passengers, Defendant Carnival Corporation filed a *Daubert*[3] motion to strike two experts, Ross Klein and Howard Wood, retained by Plaintiff David Carideo, and also sought, in the same motion, an order excluding all of Plaintiff's non-retained experts. [ECF No. 79]. Mr. Carideo filed an opposition response, and Carnival filed a reply. [ECF Nos. 85; 87].

The motion requires the Court to resolve, among other issues, the following question: may a party successfully *Daubertize* a proposed expert who has no formal academic training or actual work experience in the field in which he wants to offer opinions, but has obtained knowledge of the topic through comprehensive review and research (of materials primarily prepared by others) and who then writes about topics in the field?

For reasons outlined in greater detail below, the Court **grants in part** and **denies in part** the motion to strike. At bottom, however, *most* (but not quite all) of Carnival's challenges to Plaintiff's two retained experts, though undoubtedly generating ample grounds to significantly question the experts' opinions, are best addressed by vigorous

Concerning *Daubert* Motions, where both sides filed objections to the Report but the District Court adopted it in its entirety).

[3]    *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

cross-examination at trial. However, some of the expert opinions overlap, and the Court therefore will not permit two experts to provide opinions on the same topic (i.e., whether the attack on Mr. Carideo was foreseeable and whether Carnival provided adequate security).

Carnival's challenge to the non-retained experts does not sufficiently consider the important fact that these non-retained experts are (with one exception) treating doctors who are permitted to offer trial testimony as **fact** witnesses.

However, to the extent Plaintiff wants these treating doctors to provide *opinion* testimony, the disclosures are inadequate under Federal Rule of Civil Procedure 26(a)(2)(C). But the Court cannot yet determine whether their opinions will be permitted at trial because it is not yet clear whether their opinions affected their *treatment*, which concerns their factual testimony. Carnival did not take their depositions, so the connection between any expert opinions and treatment is unknown to the Court. Therefore, the Court **defers** ruling on the admissibility of the non-retained doctors' opinions until trial -- but any opinion not necessary for medical treatment will not be permitted. The doctors will, however, be able to testify as fact witnesses.

But the other, unretained, non-medical expert -- who is expected to opine on damages -- is in a different situation. The Court **grants** Carnival's motion to exclude expert opinion testimony from Jim Thompson because Plaintiff never disclosed an expert report and because the succinct explanation Plaintiff provided for the non-

retained experts applies only to *doctors* (and because Plaintiff never provided a disclosure beyond the word "damages" to describe this non-retained expert's opinion). This final non-retained expert may, however, testify as a lay, fact witness (**if** he is one -- a question that neither side has answered or even discussed in their written submissions).

**Factual Background**

In late October 2016, Plaintiff was a cruise passenger onboard the Carnival *Inspiration* for an electronic dance music themed cruise coined the "Groove Cruise," which Whet Travel, Inc. marketed and promoted.[4] After walking through the ship's main, central atrium and proceeding down a passenger stateroom corridor sometime after midnight, Plaintiff alleges, two fellow passengers suddenly assaulted him. Plaintiff claims that the two passengers began yelling at him and ran towards him, assaulting him in the corridor. Plaintiff essentially contends that he was "jumped" by two passengers, one of whom was the boyfriend of a woman he had brought back to his cabin earlier that evening for a drink (of tequila, as it turned out).

A Carnival security officer who was patrolling the deck above heard the altercation and responded to the scene. By that time, though, Plaintiff had already been beaten. The security officer separated Plaintiff and one of his assailants.

---

[4]     Plaintiff and Whet Travel, Inc. settled and filed a joint stipulation, and the Court dismissed the lawsuit against Whet Travel, Inc. with prejudice. [ECF Nos. 72-73].

Plaintiff's Second Amended Complaint ("SAC") brings two counts against Carnival, both sounding in negligence -- negligence (Count II) and negligence by joint venture with Whet Travel (Count III) -- and claims Carnival is liable for his injuries. [ECF No. 62].

The SAC alleges that the "Groove Cruise Los Angeles 2015" promoted on-board and off-ship parties, such as one on Catalina Island, California, where Carnival sold alcohol and "tables and bottles" of alcohol to cruise passengers. [ECF No. 62, p. 2]. It further alleges that the cruise promoted "three (3) full days and nights of drinking, music and 'DJs.'" [ECF No. 62, p. 3].

According to the SAC, Whet Travel, Inc. promoted "The Groove Cruise Los Angeles 2015" as a major drinking party, including a pre-cruise drinking party at a Los Angeles nightclub, numerous open deck parties onboard the ship during the cruise, and parties were held in the ship's "arsenal" of bars and lounges, including advertising discounted bottles of hard liquor, the "pre-ordering" of "tables" and "bottles," and the advertising the most "outrageous theme parties imaginable," with a dozen DJ's throughout the ship, constant day and night parties, music, and even an on shore party with "VIP" "tables and bottles" on Catalina Island, including the promotion of a "no sleep" atmosphere. [ECF No. 62, pp. 3-4].

The SAC further alleges that "during the three days of partying, billed as an electronic music dance party, passengers engaged in drinking both on and off the ship

at Whet Travel, Inc.'s Catalina Wine Mixer, a VIP drinking party, and became intoxicated to the point of vomiting around the ship and reaching points of inebriation, such that they became physically ill." [ECF No. 62, p. 4].

As outlined in the SAC, the assault on Mr. Carideo began shortly after midnight, when the assailants began screaming at him, threatening to "get him" and to "kill him" as they rushed him. [ECF No. 62, p. 5]. Their screams were loud, aggressive and slurred. The assailants threw Mr. Carideo to the ground, striking him in the face and body, stomping on him, kicking his head and face, resulting in a severe "blowout fracture" to his skull and permanently debilitating injuries to his head, face and sight, including irreversible nerve damage. [ECF No. 62, p. 6].

Focusing on the alcohol-focused theme of the cruise, the SAC alleges that Carnival and Whet Travel Inc. entered into a sales incentive for the sharing of revenues once a specific amount was reached, including revenues derived from the sale of alcoholic beverages. So, the more liquor that was sold, the higher the revenues shared by Whet Travel Inc. and Carnival.

Mr. Carideo alleges that Carnival "grossly understaffed the security personnel on the vessel" and that the security staff was overworked. [ECF No. 62, p. 8]. He also contends that Carnival knew or should have known that the Groove Cruise created a dangerous and hazardous condition where guests would become inebriated, resulting in assaults and attacks. In addition, he alleges that Carnival failed to exercise reasonable

6

care, including instituting reasonable security, reasonable warnings, or reasonable crowd controls, or to control or discourage excessive drinking, and made no reasonable effort to control or manage or limit the service of alcohol and/or provide reasonable management of dangers known to Carnival and not apparent to passengers, such as Plaintiff. By way of summary, Plaintiff alleges that Carnival breached its duty to provide reasonable security and management and control of the crowd.

Carnival denies those allegations and asserts myriad affirmative defenses, including that the "unforeseeable criminal acts of a third party or parties are the proximate cause" of Plaintiff's injuries (i.e., the third affirmative defense), and that Carnival at no time had "constructive or actual notice of any risk-creating condition" (i.e., the fourth affirmative defense). [ECF No. 65, p. 7].

<u>Ross Klein (Background and Opinions)</u>

Plaintiff's expert witness disclosure contends that Dr. Klein "is an expert on the cruise industry and cruise tourism whose testimony will include a historical overview of the foreseeability of crime on persons aboard cruise ships, and the incidence of assault related crime and misconduct on cruise ships during theme cruises" and the "foreseeability of the specific passenger on passenger assault" in this case. [ECF No. 79-1, p. 1].

But Dr. Klein is a *sociologist*, not a professionally-trained law enforcement officer or an academic who obtained a degree in criminology. His report describes his

academic training as follows: "in sociology (particularly research methods and data analysis) and in social work, and my involvement in training of students for a wide range of practice settings in social work." [ECF No. 79-1, p. 8]. Dr. Klein received a B.S. degree with a triple major (sociology, social work, and secondary education). He received a Masters and a Ph.D. in Sociology. He is currently Associate Dean for Graduate Studies and Research in the School of Social Work at a Canadian university. His teaching before was "balanced between research methods and social work practice." [ECF No. 79-1, p. 8].

In a September 21, 2012 deposition given in another cruise ship case (albeit one against NCL (Bahamas) Ltd., not Carnival),[5] Dr. Klein said that he is also a professor "in the tourism program" at Memorial University of Newfoundland, in Canada, but did not list that in his expert witness report. [ECF No. 79-2, p. 4]. His C.V. attached to his expert report in the instant case says that he was a professor in the tourism program from 2010 to 2013. Carnival attached Dr. Klein's 2012 deposition transcript from the other lawsuit to the *Daubert* motion it filed here. The same law firm that represented NCL in the 2011 case is also representing Carnival in the instant case. Carnival did not take Dr. Klein's deposition in this case, and it did not take the deposition of any other expert witness (retained or otherwise) either.

---

[5]      *Doe v. NCL (Bahamas), Ltd.*, Case No. 11-22230 (S.D. Fla. 2011).

Nevertheless, despite his academic training in sociology and the absence of formal training in criminal justice, criminology, crime scene investigations, or security, Dr. Klein has been retained as an expert witness in many cruise ship cases involving alleged criminal assaults.

In his expert report, he describes himself as a "recognized international authority on the cruise industry and cruise tourism," and notes that he testified four times before the U.S. Congress. [ECF No. 79-1, p. 7]. His report also explains that his "international stature means I am frequently contacted by media." [ECF No. 79-1, p. 7].

His primary area of research and publication since 1998 has been "the international cruise industry and cruise tourism." [ECF No. 79-1, p. 9]. One article he published (in 2015) is entitled "Crime at Sea: A Comparison of **Crime** on **Carnival Cruise Lines**, 2007-2011." [ECF No. 79-1, p. 10 (emphasis added)]. And one of his appearances as a witness before the U.S. Congress was in a hearing on "Crimes Against Americans On Cruise Ships." [ECF No. 79-1, p. 13].

Dr. Klein founded and maintains the website Cruise Junkie dot Com, and in 2005, he established the International Centre for Cruise Research.

Dr. Klein's expert report explains that his opinions are based on, among other sources, "almost 20 years of research and academic writing on the cruise ship industry, including crime and person overboard incidents on cruise ships." [ECF No. 79-1, p. 7].

For this case, Dr. Klein offers three overarching opinions:

A. That Carnival Cruise Lines projects an image that a cruise ship is safe, and the cruise line does not contradict Whet Travel's image that a cruise is safe; consequently passengers board Groove Cruise unaware there is risk of assault or other crime;

B. That the physical assault of Mr. Carideo was foreseeable insofar as the incidence of assault is known, that assault is known to be correlated with intoxication, and that Groove Cruise is characterized by high alcohol consumption and wide use of drugs;

C. That safety and security implemented by Carnival Cruise Lines appear inconsistent with the nature of a cruise such as Groove Cruise.

[ECF No. 79-1, p. 14].

Dr. Klein's report then provides further detail for each of the three opinions.

Dr. Klein's report notes that he has been retained as an expert witness in 18 other cases since 2002. All (with one exception) are lawsuits against cruise ships. Apparently, almost all of those other lawsuits did not involve a defense *Daubert* motion to exclude Dr. Klein or limit his testimony. One, however, did: *Horne v. Carnival Cruise Lines*, Case No. 15-21031 (S.D. Fla.). The same law firm defending Carnival in the instant lawsuit also represented Carnival in *Horne*, and the same defense attorney filed *Daubert* motions against Dr. Klein in both cases.

*Horne* involved a passenger aboard the Carnival ship *Sensation* who alleged that other passengers forced their way into her stateroom and raped and assaulted her there. Plaintiff's counsel retained Dr. Klein in that case, and Carnival filed a *Daubert* motion

10

(significantly similar to the one filed here) to strike his testimony. [ECF No. 65, Case No. 15-21031].

After a non-evidentiary hearing, District Judge Cecilia M. Altonaga entered an Order granting in part Carnival's *Daubert* motion to strike Dr. Klein. [ECF No. 92, Case No. 15-21031]. Specifically, Judge Altonaga ruled that Dr. Klein *would* be permitted to testify about the following opinions at trial: (a) the incidence of sexual victimization of passengers on Carnival cruises is substantial; thus, Carnival should have investigated the severity of this problem and crafted security procedures that responded accordingly; and (b) the average American citizen is unaware of the hidden risks on a cruise, created by the variety of cultural views held by both the passengers and the crewmen, who are there to provide safety to the passengers.

However, Judge Altonaga **prohibited** Dr. Klein from offering trial testimony on the following opinions: (a) young passengers have a higher risk of sexual victimization, and (b) Carnival should have warned its passengers that its security personnel do not have adequate training and that the ship does not have the resources to provide adequate safety. In addition, Judge Altonaga also determined that Dr. Klein would be permitted to testify regarding Carnival's alleged misleading representations of the relative safety onboard a cruise ship only to the extent Plaintiff can establish that she viewed and relied upon these representations or omissions.

<u>Howard Wood (Background and Opinions)</u>

Mr. Carideo's expert witness disclosure explains that Mr. Wood is a "security and counterterrorism specialist" who would testify about the reasonableness of Carnival's security measures in general and also for the Groove Cruise, in particular. [ECF No. 79-1, p. 2].

Mr. Wood has more than 44 years in the security field, including more than 25 years as a U.S. Secret Service agent and more than 20 years as a security consultant. He has a B.S. degree in criminology and his forensic security consulting business involves testimony for both plaintiff and defense, including the issuance of opinions in cruise ship incident cases.

Mr. Wood's resume does not mention any books, treatises or articles he authored, nor does it mention any professional presentations he has given.

Mr. Wood offers 13 opinions in his report, and many of them are divided into additional sub-opinions. Mr. Wood's overall opinions can be summarized into one sentence: Carnival provided inadequate security, given the nature of the Groove Cruise.

The 13 specific opinions[6] are as follows: (1) Carnival knew or should have known that the attack on Mr. Carideo **was foreseeable** (given the high level of alcohol

---

[6]     To increase comprehension, the Undersigned has reworded Mr. Wood's opinions to make them more streamlined and less rambling (but has not changed their substance). [ECF No. 79-1, pp. 61-68 (emphasis added)].

consumption during the Groove Cruise); (2) He **defers** to Dr. Klein on the issue of the incident's **foreseeability;** (3) Based on required incident reports filed with the FBI, Carnival reported 5 assaults with serious bodily injury aboard its cruise ships in the three years before Mr. Carideo's attack; (4) An FBI deputy assistant director advised a Congressional subcommittee that physical assaults on ships were predominantly confrontations between adult males and a "high percentage" were alcohol-related incidents;[7] (5) Carnival's security was inadequate for the Groove Cruise; (6) Carnival should have had patrols on their passenger decks; (7) Carnival should have provided a security patrol on Deck 7 (where Mr. Carideo was assaulted) of the *Inspiration* between midnight and 1:00 a.m.; (8) Carnival had inadequate number of security personnel on duty between midnight and 1:00 a.m.; (9) Carnival should have provided security patrol of Deck 7;[8] (10) Carnival did not have an adequate security policy and procedure in place for the cruise; (11) the proximate cause of the assault was Carnival's inadequate security; (12) the physical assault on Plaintiff was "more likely than not … caused or contributed to by the opportunity provided by lack of security;" and (13) given the close proximity of the assault location to the ship's security office, the assault on Mr. Carideo

---

[7]     This is not actually an "opinion." Instead, it is merely a reference to a statistic. So it might better be deemed a source he relied upon to form an opinion (such as his opinion that Carnival did not provide adequate security on the Groove Cruise).

[8]     Some of Mr. Wood's 13 overall opinions overlap.

"more than likely would not have occurred" if "reasonable security measurements[9] were implemented by employing more guards and manning the security room."

<u>The "Unretained" Experts</u>

Plaintiff's expert witness disclosure lists ten persons who are "not specially retained experts" but who "may be called upon" to offer "opinion testimony" about "liability issues and/or such medical topics as injury, diagnosis, symptoms, causation, prognosis, impairment, disability, and the necessity and reasonableness of past and future medical care, if any." [ECF No. 79-1, pp. 3-4]. Eight of these experts are doctors, one is a "treating psychotherapist" (with an MFT degree) and one is a "controller/account manager" who is listed as an expert for "economic damages." [ECF No. 79-1, p. 4].

No **expert** reports were provided, though Plaintiff's disclosure contends that standard *physician* reports and medical records were provided to Carnival during discovery. The expert witness disclosure says nothing about opinions or records concerning "economic damages," however. And the summary-type explanation about liability issues and medical topics do not on their face even remotely relate to the controller/account manager for a California cabinet company.

---

[9]     Presumably, Mr. Wood intended to say security "measures," not "measurements."

The Parties' Contentions

Dr. Klein

Carnival contends that Dr. Klein's opinions are not supported by a reliable methodology. It accuses him of subjectively reclassifying data and statistics of earlier assault allegations that Carnival provided to the FBI to opine that the rate of assault on Carnival's vessels is actually higher than reported. Carnival notes that Dr. Klein previously testified (in another cruise ship lawsuit filed in our district) that his reclassification is based on his own understanding of *Canadian* assault laws -- and emphasizes that he is not a lawyer and lacks legal training.

In addition, Carnival argues that Dr. Klein relied only on unsubstantiated claims that the Groove Cruise is associated with "high consumption of alcohol and other intoxicants" to support his opinion that the risk of assault is higher for this type of specialty cruise and that Carnival should have provided enhanced, additional security. [ECF No. 79, p. 3].

Carnival also argues that Dr. Klein's expert opinion testimony should be excluded under Federal Rule of Evidence 403's balancing test because of its "high potential to confuse or mislead the jury." [ECF No. 79, p. 7].

In response to Carnival's motion, Plaintiff points out that Carnival's primary accusation that Dr. Klein subjectively reclassified statistics is based on his deposition testimony from *another* case and notes that Carnival never took his deposition in *this*

case. Thus, Plaintiff argues that Carnival has not established that Dr. Klein would provide identical testimony in this case.

Moreover, Mr. Carideo contends that it is illogical to compare cases precluding experts from engaging in improper extrapolation from scientific studies, such as epidemiological studies, to the present scenario involving only a negligent security claim that does not involve "very particular and scientific determinations of causation." [ECF No. 85, p. 3].

According to Plaintiff's opposition, Carnival's *Daubert* motion is primarily a challenge to Dr. Klein's academic training as a sociologist, not a scientist. Therefore, he says, Carnival's challenge is, for all practical purposes, based on the notion that Dr. Klein is "not a scientist and therefore is not offering 'scientific' evidence based upon 'scientific' principles." [ECF No. 85, p. 4]. But Plaintiff says that Dr. Klein is offering non-scientific expert opinions, where "'*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" [ECF No. 85, p. 4 (quoting *United States v. Hankey*, 203 F. 3d 1160, 1169 (9th Cir. 2000)].

Finally, Plaintiff argues that Mr. Klein's opinions are not subject to being excluded simply because they are based solely or mostly upon *experience*. He contends that the opinions are permissible because "a witness who possesses general knowledge

16

of a subject may qualify as an expert despite lacking specialized training or experience, so long as his testimony would likely assist the trier of fact." [ECF No. 85, p. 8].

Mr. Wood

Carnival argues that Mr. Wood's report does not provide anything to explain how or why his experience (as a Secret Service agent or security consultant) led to an acceptable and reliable methodology. It contends that Mr. Wood's report and opinions "mirror a Plaintiff's closing argument" and result in opinions expressed in "a cursory manner." [ECF No. 79, p. 4]

In response, Plaintiff argues that Carnival's challenge affect the weight of his opinions, not their admissibility. He also notes that (1) experience may be a sufficient foundation for expert testimony, (2) Mr. Wood is experienced and his experience is tied to his opinions, and (3) in any event, his opinions are based on more than merely his own experience.

Non-Retained Experts

Carnival argues that all treating physicians and other professional witnesses are prohibited from offering opinions on liability, causation of Plaintiff's damages "and other inappropriate opinions" because they have not submitted expert reports in compliance with Federal Rule of Civil Procedure 26(a)(2)(B) and because the opinions "were not formed and are not based upon observations made during the course of their treatment." [ECF No. 79, pp. 10-11 (internal citations omitted)].

Carnival's argument focuses on the doctors and does not raise specific arguments about Jim Thompson, who is listed as being associated in some way with Fine Stone & Cabinetry, Inc., in California, and is also designated as "controller/account manager" (presumably for Fine Stone) to provide testimony on "economic damages." [ECF No. 79-1, p. 4].

Mr. Carideo's response focuses only on the treating physicians, who he describes as "hybrid lay/expert witnesses." [ECF No. 79-1, p. 9]. It says nothing about Mr. Thompson.

Plaintiff contends that Rule 26(a)(2)(B)'s written report requirement applies only to experts specially retained to provide testimony in the case and that treating physicians can therefore testify at trial without providing a written report. He also argues that the summary-type description and the reference to medical records is sufficient to comply with Rule 26(a)(2)(C)'s disclosure requirements.

## Applicable Legal Principles & Analysis

The admission of expert testimony is governed by Federal Rule of Evidence 702, as explained and refined by the United States Supreme Court in *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

Rule 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993) (internal citations omitted). Because the task of evaluating the reliability of expert testimony "is uniquely entrusted to the district court" under *Daubert*, appellate courts

give district courts "considerable leeway in the execution of their *Daubert* duties." *Rink*, 400 F.3d at 1291 (internal quotations omitted).

> To warrant or permit the use of expert testimony, two conditions must be met: first, the subject matter must be closely related to a particular profession, business or science and not within the common knowledge of the average layman; second, the witness must have such skill, experience **or knowledge** in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.

*Faircloth v. Lamb-Grays Harbor Co.*, 467 F.2d 685, 694 (5th Cir. 1972) (internal quotation omitted) (emphasis supplied).

Concerning qualifications, an expert needs to be minimally qualified, and any objections to the level of his expertise typically go to the credibility and weight of the expert's opinion, not the admissibility of it. *See Clena Invs., Inc. v. XL Specialty Ins. Co*, 280 F.R.D. 653, 661 (S.D. Fla. 2012). The test is "whether the subject matter of the witness's proposed testimony is sufficiently within the expert's expertise." *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1367 (M.D. Ga. 2010) (internal citation omitted).

A lack of formal education does not automatically preclude an expert from testifying because "**experience** in a field may offer another path to expert status." *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1372 (S.D. Fla. 2005) (emphasis supplied) (citing *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004)). Indeed, the Committee Note to the 2000 Amendments of Rule 702 explains that "[n]othing in this amendment is

intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 Advisory Committee's Note, 2000 Amendment.

Rule 702 requires an expert witness to have "specialized knowledge" regarding the area of testimony. Fed. R. Evid. 702(a). As noted, the basis of this specialized knowledge "can be practical experience as well as academic training and credentials." *Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990) (internal citation omitted); *Hammond v. Int'l Harvester Co.*, 691 F.2d 646, 653 (3d Cir. 1982) ("under Rule 702, an individual need possess no special academic credentials to serve as an expert witness. . . . (P)ractical experience as well as academic training and credentials may be the basis of qualification (as an expert witness).") (internal quotation omitted); *see also Galarza v. Carnival Corp.*, No. 15-24380, 2016 WL 7507883, at *1 (S.D. Fla. Aug. 8, 2016) ("experts may be qualified in various ways," such as "scientific training or education" and "experience in a field").

Courts have liberally interpreted the specialized knowledge requirement, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994); *see also Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quoting *In re Paoli R. R Yard*, 35 F.3d at 741 for this proposition).

Given this flexibility, a witness "who possesses **general knowledge** of a subject may qualify as an expert despite lacking specialized training or experience, so long as

his testimony would likely assist a trier of fact." *Whelan v. Royal Caribbean Cruises, Ltd.*, 976 F. Supp. 2d 1328, 1331 (S.D. Fla. 2013) (emphasis added) (rejecting challenges to pulmonologist and hematologist in wrongful death action against cruise ship company) (internal citation omitted); s*ee generally Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (rejecting *Daubert* challenge to economist in civil RICO case involving fraudulent real estate transactions even though the economist had no real estate development experience).

On the other hand, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261 (emphasis in original). "[O]ne may be considered an expert but still offer unreliable testimony." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir. 2003) (internal citations omitted).

The proponent of testimony based on experience rather than scientific knowledge must show "how that experience led to the conclusion [] reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case." *Frazier*, 387 F.3d at 1265.

Reliability of the methodology, a separate factor, requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology

can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Quiet Tech. DC-8,* 326 F.3d at 1341 (internal citation omitted).

These reliability factors, however, are non-exhaustive. *Kumho Tire*, 526 U.S. at 150. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n. 7. The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *Frazier*, 387 F.3d at 1244.

To be sure, the thoroughness of an expert's investigation may play a role in determining if the opinion's methodology is reliable; however, the Court does not make this judgment in a vacuum. The fact that an expert did not personally inspect the scene of an incident or physically inspect all allegedly defective products is not by itself determinative; personal inspections are not necessarily required.[10]

---

[10]     *See Bryant v. BGHA, Inc.,* 9 F. Supp. 3d 1374, 1392 (M.D. Ga. 2014) (permitting opinion of expert who did not personally visit the scene of the incident and did not inspect the hunting tree stand because he relied upon partner's measurements, photos, and data); *Desert Falcon-Special Mar. Enter. v. E. Coast Terminal Co.,* No. 402CV156, 2004 WL 5612966, at **3-4 (S.D. Ga. Jan. 5, 2004) (finding failure to view the actual collapsed crane insufficient to render expert's opinion inadmissible); *Hankins v. Ford Motor Co.,* No. 3:08-cv-639, 2011 WL 6046304, at *5 (S.D. Miss. Dec. 5, 2011) (finding expert was not required to inspect the accident site or the plaintiff's vehicle because opinion based on

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation[.]" *Masferrer*, 367 F. Supp. 2d at 1371.

Expert testimony is admissible "if it concerns matters that are beyond the understanding of the average lay person." *Whelan*, 976 F. Supp. 2d at 1332 (internal quotation omitted). Expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding that jurors are able to comprehend for themselves. *Id.* (internal quotation omitted). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005).

The party proffering the expert has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (internal citation omitted). "Where the burden has not been satisfied, [Rule

---

accident reconstruction reports and other case-specific information, combined with experience in field and research, was sufficient).

702] precludes expert testimony." *Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1351 (N.D. Ga. 2001), *aff'd sub nom.*, *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194 (11th Cir. 2002).

Expert testimony must be "based on sufficient facts or data" to be admissible. Fed. R. Evid. 702. The facts or data must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. Because experts can "opine about a complicated matter without any firsthand knowledge of the facts in the case," the trial court's gatekeeping role is "especially significant." *Frazier*, 387 F.3d at 1260; s*ee also Daubert*, 509 U.S. at 592 (finding that expert's "wide latitude to offer opinions" is "premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.").

As outlined above, Carnival is challenging all of Mr. Carideo's experts. There is no doubt that the two retained experts' opinions here can be legitimately challenged as flawed in *some* way (and perhaps in many ways).

Nevertheless, mistakes, defects, omissions, problems, and weaknesses with an expert's opinion do not necessarily mean that it must be *excluded*. To the contrary, many challenges to expert testimony ultimately can be viewed as an attack on the *weight* of the expert's opinions, which can be addressed at trial through vigorous cross-examination. *Holiday Inns, Inc. v. Holiday Out in Am.*, 481 F.2d 445, 447 (5th Cir. 1973) ("format of the

questions and the manner of conducting the survey" go to "the weight of [the] evidence"); *see Pods Enters., Inc. v. U-Haul Int'l, Inc.*, 12-01479, 2014 WL 2625297, at **2-3 (M.D. Fla. June 12, 2014) ("improper universe" and "improper questioning" were "technical deficiencies" that "go to the weight of [the] opinions, not their admissibility"); *Hoff v. Steiner Transocean, Ltd.*, No. 12-22329, 2014 WL 273075, at *4 (S.D. Fla. Jan. 24, 2014) ("As long as a reliable basis exists for the expert's opinion, it is admissible, and it is then up to the parties to vet the opinion before the jury."); *Nightlight Sys., Inc. v. Nitelites Franchise Sys., Inc.*, No. 1:04–CV–2112–CAP, 2007 WL 4563873, at *7-8 (N.D. Ga. July 17, 2007) (finding allegedly flawed survey universe and question formats were technical deficiencies of weight, not admissibility).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8,* 326 F.3d at 1341; *Maiz,* 253 F.3d at 666 ("A district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'") (quoting *Allison.,* 184 F.3d at 1311). Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink,* 400 F.3d at 1293 n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC–8,* 326 F.3d at 1341 (quoting *Daubert,* 509 U.S. at 596).

Because Carnival has challenged some of the specific opinions of Dr. Klein and Mr. Wood as being based on either a lack of applicable expertise or unreliable methodology, the Court is compelled to stress that a less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.,* No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.") (internal quotation omitted).

Similarly, the Court "must be *careful not to conflate questions of **admissibility** of expert testimony with the* weight appropriately to be accorded to such testimony by the fact finder." *In re Trasylol Products Liab. Lit.,* 2010 WL 1489793, at *7 (quoting *Quiet Tech,* 326 F.3d at 1341) (emphasis supplied).

When assessing Carnival's motion, the Undersigned also needs to address the reality that certain types of witnesses need not provide expert witness reports under Rule 26(a)(2)(B). The Advisory Committee Notes to the 1993 amendments explain:

> The requirement of a written report in paragraph (2)(B), however, applies only to those who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony. A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report.

Fed. R. Civ. P. 26(a)(2)(B), Advisory Committee's Note, 1993 Amendment.

The Advisory Notes to the 2010 amendments further explain that:

A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705. Frequent examples include physicians or other health care professionals and employees of a party who do not regularly provide expert testimony. Parties must identify such witnesses under Rule 26(a)(2)(A) and provide the disclosure under Rule 26(a)(2)(C).

Fed. R. Civ. P. 26(a)(2)(C), Advisory Committee's Note, 2010 Amendment.

Rule 26(a)(2)(C) requires the disclosure, for an expert witness who did not provide a written report, of "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a **summary** of the **facts and opinions** to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C) (emphasis supplied).

Therefore, to provide one illustration, a treating physician need not provide an expert report but the "Plaintiff is still obligated to provide disclosures for those witnesses, if they are to give *expert* testimony, under Rule 26(a)(2)(C)." *Bodden v. Quigley*, No. 13-cv-21834, 2014 WL 5461807, at *2 (S.D. Fla. Oct. 27, 2014) (emphasis added).

Nevertheless, treating physicians who testify only as lay witnesses might still be able to testify about the cause of the injury if "their opinions about the cause of injury are needed to explain their decision-making processes to the jury or whether their opinions about the cause of injury pertained to treatment (i.e., whether the treating physicians needed to know what caused the accident in order to treat the Plaintiff)."

*Bodden*, 2014 WL 5461807, at *2 n.2 (internal citations omitted); *see also Wilson v. Taser Int'l, Inc.,* 303 F. App'x. 708, 712-13 (11th Cir. 2008) (same).

The Court will rule on the motion by first addressing the non-retained experts.

Plaintiff has not provided much information about Mr. Thompson. It identified him only as a controller/account manager, presumably for the California cabinet company listed under his name. Plaintiff provided no summary of Mr. Thompson's expert opinions and did not explain whether he would also have lay witness testimony to provide at trial.

Plaintiff's sole description of Mr. Thompson's anticipated opinion testimony as a non-retained expert is "economic damages." That does not comply with Rule 26(a)(2)(C)'s requirement that the party seeking to obtain opinion testimony from an expert witness "not required to provide a written report" disclose "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). That two-word description is hardly a "summary" of his opinions. Therefore, Mr. Carideo may not offer opinion testimony from Mr. Thompson. As noted above, Plaintiff did not in its response even mention why Mr. Thompson's opinion testimony should be permitted.

Mr. Thompson might conceivably have the ability to testify as a fact witness, but the Court is unsure about his factual role in this case, if any. However, if Plaintiff intends to use Mr. Thompson as a fact witness, then Rule 26(a)(1)(A) requires him to

have made an initial disclosure of his contact information and the subject of his discoverable information. Fed. R. Civ. P. 26(a)(1)(A). The parties have not submitted to the Court a copy of Mr. Carideo's Rule 26 disclosures for fact witnesses. If Mr. Carideo complied with the Rule (and if Mr. Thompson has relevant factual information), then this Order does not prevent him from using Mr. Thompson's fact testimony. But if there was no Rule 26(a) disclosure for Mr. Thompson, then Plaintiff may not call him as a fact witness at trial.

For the non-retained expert physicians, Plaintiff's disclosure was as follows: they might offer opinion testimony "regarding liability issues and/or such medical topics as injury, diagnosis, symptoms, causation, prognosis, impairment, disability, and the necessity and reasonableness of past and future medical care, if any." [ECF No. 79-1, pp. 3-4]. This is not what Rule 26(a)(2)(C)(ii) had in mind by its requirement that "a summary of the facts and opinions" be disclosed. Fed. R. Civ. P. 26(a)(2)(C)(ii).

The topics listed above are not a summary of a specific treating doctor's **opinion.** To the contrary, it is simply a laundry list of every conceivable *topic* on which a doctor might opine on in any type of case. It is the medical equivalent of the proverbial "kitchen sink." In fact, it would be difficult to imagine a medical topic **not** included in the list provided in the disclosure. Indeed, this list could be used in every lawsuit involving a treating physician whose opinions the patient sought to present at trial.

So Plaintiff's disclosure is inadequate and unhelpful. My conclusion is bolstered by a comparison of a disclosure where compliance with the rule was evident. In *Bodden*, for example, the defendant sought to preclude the plaintiff's treating physicians, Drs. Hall and Mills, from testifying about the cause of injury, which the Court denied because the doctors' expert disclosures (without a report) were permissible under Rule 26(a)(2)(C). 2014 WL 5461807, at **1-2. For Dr. Mills, the plaintiff provided a four-paragraph disclosure that summarized his actual opinion on causation: that the accident at issue caused an injury to the lumbar spine, which resulted in the need for lumbar surgery in the form of laminectomies, hemilaminectomies, facetectomy, escision of lumbar disks, foraminotomies, and interbody cage placement at L5-S1. [ECF No. 48-1, pp. 2-4, Case No. 13-21834]. For Dr. Hall, the plaintiff provided a five-paragraph summary that included his opinion on causation: that the subject automobile accident caused a lumbar spine injury, resulted in several surgeries and procedures, and caused a permanent injury to his low back, resulting in continued symptoms requiring future care and treatment. [ECF No. 48-1, pp. 6-7, Case No. 13-21834].

So Plaintiff here, has not complied with Rule 26(a)(2)(C)(ii) for all the non-retained treating physicians.

However, these doctors could potentially be authorized to provide opinions at trial on causation if they needed to know what caused Mr. Carideo's injuries to treat him. Because the parties have not taken the depositions of the doctors and have not

explained the nuances of the doctors' medical treatment of Mr. Carideo, the Court is not

in a position to issue a final ruling until trial. *See generally United States v. Henderson,* 409

F.3d 1293, 1300 (11th Cir. 2005) (explaining that the treating doctor "did not need to

determine how [the patient] was injured to treat him in this case" and noting that her

"diagnosis of the injury itself, that [the patient's] jaw was fractured, would be

permissible lay testimony, but her statement about the cause of the injury was, as she

admitted, a 'hypothesis'" -- and then emphasizing that "the ability to answer

hypothetical questions is '[t]he essential difference' between expert and lay witnesses")

(internal citations omitted).

The Court now turns to the admissibility of Dr. Klein's opinions.

Carnival will surely be able to demonstrate significant problems with his

opinions at trial. Plaintiff has not in this case contended that Dr. Klein has any academic

training in law enforcement, criminology, security, criminal investigations, or tourism.

Likewise, he does not seem to have any working experience in these fields. Moreover,

Dr. Klein has not (as far as the parties have advised this Court) worked for a cruise ship

company.

Instead, it seems as though Dr. Klein has, for all practical purposes, tried to

transform himself into an expert on the cruise ship industry by studying the field,

writing articles and books about it, and giving lectures and conference presentations.

Dr. Klein's report represents that he is "actively involved in research producing four

books, six monographs commissioned by nongovernmental organizations, twenty-five academic articles and seventeen book chapters specifically about the cruise industry and cruise tourism." [ECF No. 79-1, p. 7].

Dr. Klein is undoubtedly prolific. He explains that his research and academic writing on the cruise ship industry is drawn from several sources, including media reports, participation at industry trade shows, discussions with crew members aboard cruise ships, more than 330 days of "participant observation on cruise ships," files provided in discovery in civil litigation, data presented to Congress, crime reports secured from the FBI through Freedom of Information Requests, and "academic and nonacademic studies and reports." [ECF No. 79-1, p. 7].

So Dr. Klein has done a lot of reading about the cruise industry and has been asked to speak at conferences and seminars and at Congressional hearings. The question, therefore, is whether this type of **knowledge** is sufficient to permit him to offer opinion testimony when he lacks academic training and actual experience in the field.

Plaintiff's response discusses and emphasizes the notion that *experience* may be sufficient to qualify an expert. While that point is, to be sure, legally correct, it may not be factually applicable here. There is a distinction between knowledge and experience. Dr. Klein has acquired substantial knowledge about the cruise industry, even though he

has no actual experience working in the field for a cruise ship company or a company that provides security training for cruise ship employees or independent contractors.

In addition, there is no showing that Dr. Klein has been aboard the ship in question or a similar sister ship in the same class.

Nevertheless, "an expert relying on personal knowledge and experience - as opposed to scientific training or certifications - may testify as long as he may reliably apply his experience to assist the trier of fact." *Remington v. Newbridge Sec. Corp.*, No. 13-60384, 2014 WL 505153 (S.D. Fla. Feb. 7, 2014) (denying motion to exclude expert opinion regarding the existence of a standard in the securities industry limiting the amount of allowable handling fees) (internal citation omitted).

Given that Dr. Klein has testified before Congress and has been permitted to offer opinion testimony in other lawsuits, the Court will not grant Carnival's motion and will not prevent him from offering expert opinion testimony, in general. His opinions are certainly susceptible to significant challenge, but they meet the minimum, flexible requirements. Carnival's challenges are "more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (quoting *Hemmings v. Tidyman's Inc.*, 258 F.3d 1174, 1188 (9th Cir. 2002) (noting that any inadequacies were addressed in cross-examination of the expert)).

However, the Court will <u>limit</u> Dr. Klein's opinion testimony (for both trial and summary judgment purposes) because part of it is duplicative (as opposed to being the subject of a successful *Daubert* challenge to his credentials and qualifications and foundation for his opinions).

Specifically, Dr. Klein will not be permitted to offer his third opinion -- that "safety and security implemented by Carnival Cruise Lines *appear i*nconsistent with the nature of a cruise such as Groove Cruise." [ECF No. 79-1, p. 14 (emphasis supplied)]. This opinion is duplicative of the opinions of Mr. Wood, who, unlike Dr. Klein, *does* have law enforcement training and actual experience in the security field. Therefore, under Federal Rule of Evidence 403, I exclude Dr. Klein's third opinion as unfairly prejudicial, likely to needlessly present cumulative evidence and generating a waste of time.

In reaching this conclusion, I note that Dr. Klein's testimony on this third opinion is somewhat equivocal. Moreover, his opinion is general and relatively vague, especially when compared to Mr. Wood's opinions on inadequate security (e.g., opinions on which specific decks should have had increased security and pinpointing the precise hours for enhanced security).

By way of summary for Dr. Klein, I find that he is qualified through knowledge (as opposed to academic training or in-field experience) to offer his first two opinions and that they would assist the jury, who likely would not have a comprehensive

understanding of the nuances of the security issues surrounding a special themed cruise like the Groove Cruise.

Carnival does not challenge Mr. Wood's credentials or experience. Instead, its major gripe is with the tone of his opinions. Carnival says that they are riddled with advocacy. Even if true, this critical comment would not by itself be sufficient to exclude all of Mr. Wood's opinions, and Carnival does not cite any legal authority holding that it would be adequate. Mr. Wood has the necessary training and experience to offer most of his opinions.

However, the Court will restrict Mr. Wood's expert opinion testimony and prevent him from offering opinions on whether the attack on Mr. Carideo was a reasonably foreseeable event. First, Dr. Klein is already offering that opinion, so the Court (and the jury, if the case were to proceed to trial) does not need to hear the same opinion from two different experts. Second, Mr. Wood expressly says that he **defers** to Dr. Klein's opinion on foreseeability. So he is not actually offering his own, independent opinion; he is merely parroting Dr. Klein's opinion.

<u>Conclusion</u>

The Court **grants in part** and **denies in part** Carnival's *Daubert* motion, as outlined above. Thus, Carnival's *Daubertizing* effort was partially successful (though the successes arose from Federal Rule of Evidence 403 and Federal Rule of Civil Procedure 26, as opposed to Federal Rule of Evidence 702 and the *Daubert* analysis).

**DONE and ORDERED** in Chambers, in Miami, Florida, on March 16, 2018.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record