**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO: 16-23658-CIV-GOODMAN**
**[CONSENT CASE]**

DAVID CARIDEO,

      Plaintiff,

v.

WHET TRAVEL, INC., et al.,

      Defendants.

_____/

**ORDER ON DEFENDANT'S SUMMARY JUDGMENT MOTION**

In October 2015, David Carideo was a passenger on a "Groove Cruise" on the *Inspiration*, a ship operated by Defendant Carnival Corporation. During that cruise, he met a woman he nicknamed "Angel Girl" (because she was wearing an angel costume to a cruise event). Angel Girl approached him and said, "You look cool, let's have some fun. I'm bored." [ECF No. 78-1, p. 23]. So he invited her back to his cabin for a drink and a protein shake.

Before they entered the room, the woman told Mr. Carideo that her boyfriend (who was also on the same cruise, along with his friends) was "crazy" and "really, really drunk." [ECF No. 78-1, p. 23]. She further revealed that her boyfriend and his friends are mixed martial arts experts who were looking for a fight or who had been in fights. [ECF No. 78-1, p. 23]. And she told him to pretend he did not know her from that

1

point on.

They went into his room (with others) and, at some point, Mr. Carideo gave her a hug. While in the room, he and Angel Girl each had a shot of Patrón tequila. Angel Girl mentioned that she was missing some money. They looked for the money, could not find it and then left the room. This lawsuit concerns the events arising after Angel Girl left Mr. Carideo's room.

To put it bluntly, things did not go well. Angel Girl's prediction (that she and Mr. Carideo would have some fun together) proved to be wildly inaccurate.

For reasons not yet made clear in the record, it seems as though the woman's boyfriend somehow learned of her visit to Mr. Carideo's cabin, and he suspected that Mr. Carideo had stolen money from his girlfriend while she was in his room.

He did not take that news well.

He and his buddy attacked Mr. Carideo, causing him severe, permanent injuries. The beating fractured his orbital bone, and he was required to undergo skull reconstruction surgery where he had a titanium implant installed. He also had eye surgery so that a mesh plate could be placed in his eye to rebuild the socket.

Mr. Carideo filed a lawsuit against Carnival and Whet Travel, Inc., the company that promoted and sold the Groove Cruise. Mr. Carideo settled with Whet Travel. [ECF Nos. 72-73]. Mr. Carideo's claims against Carnival are, in general, for negligence, but, for all practical purposes, they are for myriad subcategories of negligent security.

In its answer, Carnival asserted sixteen affirmative defenses, including (first) Mr. Carideo's own comparative negligence, (second) the injuries were caused by third parties not under Carnival's control, (third) the unforeseen criminal acts of others were the proximate cause of his injuries, and (fourth) Carnival never had constructive or actual notice of any specific risk-creating condition. [ECF No. 65]. Carnival later filed a summary judgment motion based on the affirmative defenses. [ECF No. 78].

Carnival's summary judgment motion argues that "it is not responsible for the wholly unpredictable criminal acts committed by two fellow passengers." [ECF No. 78, p. 2]. It contends that the record lacks any evidence that it was "on notice of the specific risk-creating condition of which Plaintiff complains prior to the alleged incident[.]" [ECF No. 78, p. 2]. Carnival argues that the lawsuit is merely an attempt to hold it responsible for the assault "simply on the basis that Carnival should essentially have more security officers posted everywhere throughout its ships in hopes of preventing all crimes from occurring." [ECF No. 78, p. 2]. Thus, Carnival argues, Mr. Carideo's negligence theory would "essentially turn Carnival into his insurer, but the law requires only that Carnival act with reasonable care." [ECF No. 78, p. 2].

Describing the Groove Cruise as "three days and nights of non-stop electronic dance ["EDM"] music and partying," Mr. Carideo's response opposing the summary judgment motion asserts several arguments: (1) Carnival projects the image of operating safe ships; (2) the attack was foreseeable because assaults are known to be correlated

with intoxication and the cruise at issue is "characterized by high alcohol consumption and wide use of drugs[;]" (3) Carnival knew or should have known that the attack was reasonably foreseeable; (4) Carnival reported to the FBI five assaults with serious bodily injury on its cruise ships in the three years before the attack here; (5) Carnival did nothing to improve or enhance security for this cruise and, therefore, used standard, basic security; (6) this is a negligent security case, not an on-shore failure to warn or an on-vessel slip or trip and fall case; and (7) Carnival violated its own security guidelines.[1] [ECF No. 84].

In his response, Mr. Carideo describes Carnival's "no knowledge of danger" position as being similar to the comment of Vichy French Captain Louis Renault, in the famous scene from the 1942 movie classic *Casablanca*. [ECF No. 84, p. 2]. While in Rick's

---

[1] Carnival also filed a *Daubert* motion to exclude the opinions of Plaintiff's two retained experts. [ECF No. 79]. Although the Court granted that motion in part, the Order did not exclude much from the substantive opinions offered by Howard Wood, who has more than 44 years in the security field, including more than 27 years as a U.S. Secret Service Agent, and Dr. Ross Klein, a cruise industry expert who has testified several times before Congress on cruise-related issues. [ECF No. 88]. The Court eliminated overlap between the two experts (i.e., only one expert opinion is permitted for each specific sub-issue).

For purposes of evaluating Carnival's summary judgment motion, the following opinions of Mr. Wood and Dr. Klein were not excluded and are particularly relevant: (1) Carnival knew or should have known that the attack on Mr. Carideo was reasonably foreseeable; (2) Carnival's security was inadequate, given the nature of the Groove Cruise; (3) Carnival did not have an adequate security policy and procedure for this type of cruise; (4) Carnival's inadequate security was the proximate cause of the attack on Mr. Carideo and the damages he suffered; and (5) if Carnival had used reasonable security (e.g., using more guards and manning the security room), then the attack on Mr. Carideo and the injuries he suffered would more than likely not have occurred.

Café Américain, an upscale nightclub and gambling den, the Captain announced, "I'm shocked! Shocked to find that gambling is going on in here."[2] But Mr. Carideo's response does not explain *why* the classic shocked/shocked line of movie dialogue was inaccurate or why it is relevant to his view that Carnival should not have been surprised (i.e., "shocked") about the attack. The answer is based on what happened immediately after the Captain uttered his now-famous "shocked" comment (in response to a question from Rick, the club owner played by Humphrey Bogart, about why the captain was closing his business): a croupier hands the Captain a pile of money and says, "Your winnings, sir." The Captain then responds: "Oh. Thank you very much. Everybody out at once."[3]

But regardless of Mr. Carideo's rhetorical reference to famous movie dialogue, for the reasons outlined in greater detail below, the Undersigned **denies** Carnival's summary judgment motion. Mr. Carideo should be permitted to try to present his claim to a jury.

To be sure, the testimony at trial might not unfold as explained in the summary judgment papers, and additional evidence not discussed in the submissions might be introduced and might make a difference. Therefore, this ruling does not preclude Carnival from asserting these arguments again at trial, in a motion for judgment as a

---

[2]     CASABLANCA (Warner Bros. Pictures 1942).

[3]     http://www.imdb.com/title/tt0034583/quotes (last visited March 23, 2018).

matter of law or in another type of request for relief. For now, though, Mr. Carideo has presented enough evidence and permissible theories to dodge a defense summary judgment motion.

**Factual Background**

Mr. Carideo was a cruise passenger for an October 2015 cruise onboard the Carnival *Inspiration*. [ECF No. 62, ¶¶ 16, 23]. The *Inspiration* cruised from Long Beach, California to Catalina Island and Ensenada, Mexico, before returning to Long Beach. [ECF No. 62, ¶ 12]. The specific cruise on the *Inspiration* was an electronic dance music-themed charter cruise promoted by Whet Travel, and called "The Groove Cruise Los Angeles 2015." [ECF No. 62, ¶¶ 6, 9, 17]. Plaintiff chose to go on the Groove Cruise because his friends were going as well. [ECF No. 78-1, p. 14]. Before purchasing his ticket to attend the Groove Cruise, Plaintiff visited Whet Travel's website and viewed marketing material and promotional videos displaying prior groove cruises. [ECF No. 78-1, pp. 13-14].

The "Groove Cruise Los Angeles 2015" was an EDM theme cruise. Carnival sold bottles of alcohol, buckets of beer, and had bar stations all over the ship, for a full three days and nights, to more than 2,200 young people occupying upward of 1,050 cabins aboard the *Inspiration*, with EDM playing at different venues throughout, with more than 70 DJs.

Carnival sold and served alcoholic beverages on the Groove Cruise onboard

parties. Carnival sold buckets of beer and promoted "[g]et $2 off when you buy four beers. We have stations all over the ship for you." [ECF No. 84-4, p. 89].

This was the second Groove Cruise for Carnival. [ECF No. 84-4, 35:19-23]. Carnival had the same security as usual on this cruise, including the same number of officers. [ECF No. 78-2]. However, Whet Travel had its *own* added, private security team for this specific cruise.

Two other passengers, Joshua Goldberger and Craig Hanson, assaulted Plaintiff onboard the *Inspiration* during the subject cruise.

Security Officer Rodrigues, upon hearing an argument, intervened and called for backup. Officer Rodrigues was wearing a badge and uniform. Recognizing that he was a security guard, the attackers all separated. [ECF No. 78-2, p. 10].

During the Groove Cruise, Carnival security did not conduct one of the regularly scheduled, formal, weekly security meetings during the subject cruise from October 23-26, 2015; the onboard security meeting took place as scheduled both before and after the subject cruise on October 22, 2015, and October 29, 2015. [*See* Carnival's Response to Plaintiff's Request for Admissions No. 15, ECF No. 84-2].

As phrased by Plaintiff in his response, "[d]espite the nature of the cruise, the unlimited music, drinking, and partying, including the excessive use of drugs, Carnival maintained the same security protocol for the subject cruise." [ECF No. 84, p. 3].

Based upon Carnival Cruise Line Incident Reports to the Federal Bureau of

Investigation as required by The Cruise Vessel Security and Safety Act ("CVSSA") of 2010, there were five reports of assaults with serious bodily injury reported by Carnival to the FBI occurring on its cruise ships in the three years before the attack upon Mr. Carideo.

On the last night of the cruise, Plaintiff met Coral Hibbs, who he referred to as "Angel Girl." [ECF No. 78-1, p. 23]. Plaintiff invited Hibbs and two men back to his stateroom "to go get shots [of tequila] and a protein shake." [ECF No. 78-1, pp. 23-24]. The group was inside Plaintiff's stateroom for about thirty minutes, during which time Plaintiff hugged Hibbs. [ECF No. 78-1, p. 24]. Before walking into Plaintiff's stateroom, Hibbs warned Mr. Carideo that her boyfriend and his friends were mixed martial arts fighters, and she advised him to pretend that he did not know her if they crossed paths again later on. [ECF No. 78-1, p. 23]. Later that night, Plaintiff crossed paths with Hibbs in the main atrium of the *Inspiration*; Hibbs was with her boyfriend and one of his friends at the time. [ECF No. 78-1, p. 25].

Plaintiff did as Hibbs had instructed him, and he walked past the group without looking at her. [ECF No. 78-1, p. 25]. After walking approximately 30 to 50 feet past the group and entering a corridor leading off the atrium, Plaintiff heard the men yelling at him. He stopped, turned around, and saw the men running towards him. [ECF No. 78-1, p. 25]. Plaintiff recalled being about 20 feet into the corridor off the main atrium when he was attacked. [ECF No. 78-1, p. 26].

One of the assailants punched Plaintiff in the face while still running towards him. [ECF No. 78-1, p. 26]. The second assailant placed Plaintiff in a wrestling hold and tackled him to the ground, while the first assailant punched him in the head and then kicked him in the face. [ECF No. 78-1, pp. 26-27].

Plaintiff believes the entire attack lasted three to five minutes. [ECF No. 78-1, p. 27]. The attack occurred suddenly, and Plaintiff had no warning of the impending attack before the men began yelling and running towards him. [ECF No. 78-1, pp. 35-36].

Officer Rodrigues arrived at the scene within moments of the attack and in time to apprehend one of the assailants. [ECF No. 78-2, pp. 9-10]. Rodrigues had been patrolling the passenger areas of the vessel at the time and was walking through the deck above where the incident occurred when he heard an argument between Plaintiff and the assailants. [ECF No. 78-2, pp. 9-10]. Rodrigues did not witness the physical altercation, but did find one of the assailants with Plaintiff when he arrived. [ECF No. 78-2, pp. 9-11]. Rodrigues called for additional security officers to assist with the incident, and they soon tracked down the other assailant. [ECF No. 78-2, p. 11]. After Rodrigues arrived, Plaintiff was taken to the medical center.  [ECF No. 78-2, p. 11].

At the time of the incident, in the early morning hours of the final night of the cruise, Carnival had seven security officers on duty; five officers were assigned to the night clubs throughout the ship, one was assigned to fire watch patrol, and another

officer was assigned to patrol guest areas throughout the vessel. [ECF Nos. 78-3, p. 7; 78-2, pp. 5-6]. In addition to those seven officers, Carnival also had an Assistant Chief Security Officer on duty at the time of the incident, along with the Chief Security Officer (who is always on call). [ECF No. 78-2, pp. 5-6].

Rodrigues was the officer assigned to patrol guest areas on the night in question. Following the attack on Mr. Carideo, Carnival shore-side investigator Robert Williams was notified by the ship's security, and he, in turn, contacted the FBI to report the assault. [ECF No. 78-3, p. 6].

According to Mr. Carideo, one of the attackers, Mr. Goldberger, was criminally charged with assault, convicted in federal court, and served three months in federal prison. [ECF No. 78-1, p. 38]. Goldberger was not Ms. Hibb's boyfriend. [ECF No. 78-1, p. 27].

According to Mr. Carideo, he felt afraid and alone and filed a complaint with the manager on the second night of the cruise, before being attacked. Specifically, he complained that "it is dangerous that people cannot find their friends." [ECF No. 78-1, p. 15]. And that "it's dangerous to girls that cannot find their friends, so they can walk down the hallway escorted." [ECF No. 78-1, p. 19]. In addition, Mr. Carideo said that he also complained about cellphone service being unavailable on the ship. Mr. Carideo said that he reported his concerns to more than one Carnival employee.

Mr. Carideo contends that he felt in physical danger aboard the cruise from its

inception because passengers needed medical help from either being in a fight or medics not timely arriving. He said he saw passengers getting into physical fights, including pushing, punching, and scuffling. [ECF No. 78-1, p. 36].

Whet Travel had retained its own private security company, Titan Security and Investigations. The owner said that the private security officers encounter scenarios aboard the *Inspiration* where drunk passengers had to be reported to the ship's security personnel. Mr. Carideo says that he spoke two or three times with Titan security officers on the cruise and learned that Titan had to break up a few scuffles or fights.

Carnival's security policy does not require any specific number of officers to conduct deck patrols, nor does it require that a single officer be assigned to every deck of the vessel at all times. It does, however, have a general requirement for deck patrols:

> Passenger deck patrols, if possible, should be conducted between 2200 hours and 0400 hours. The patrols are designed to maintain good order and to assure that passengers are not disturbed while in their cabins. The Security Officers on patrol should pass by every passenger cabin at regular intervals, if possible[.]

[ECF No. 84, p. 5 (quoting Carnival's "Ship Security Manual," Chapter 4.6, titled "Section Patrols.")].

At the time of the attack, Carnival security officer Rodrigues was assigned to patrol passenger decks. [ECF Nos. 78, ¶ 25; 84, ¶¶ 2-26]. Further, Rodrigues testified that he would conduct passenger deck patrols by walking from the front of the ship to the back of the ship, then go up or down to another deck and do the same, always

ensuring to maintain a random pattern. [ECF No. 78-2, p. 6-7]. During these patrols, including on the subject evening, Rodrigues would also go through the "ship lobby," on the same deck where Plaintiff's incident occurred. [ECF No. 78-2, p. 6-7].

Carnival contends that it complied with its policy concerning passenger deck patrols.

Rodrigues said that it is normal to see passengers drinking alcohol on cruises, and he does see passengers intoxicated because "they do drink." [ECF No. 78-2, p. 16]. But on this particular cruise, the Groove Cruise, he said that he did not see or have knowledge of any passenger getting drunk. [ECF No. 78-2, p. 16].

In its response to Plaintiff's Request for Admissions No. 26, Carnival admitted that its "security suspected that Plaintiff, David Carideo, and Joshua Goldberger were under the influence of alcohol at the time of the incident due to the smell of alcohol on their breath." [ECF No. 84-2, p. 6]. And in responses to Requests for Admissions 90 and 91, Carnival admitted that both Mr. Goldberger and Mr. Hanson "purchased alcoholic beverages from Carnival while onboard the *Inspiration* during the subject cruise." [ECF No. 84-2, p. 16].

In response to Requests for Admissions 96 and 97, Carnival admitted that it did not restrict Mr. Goldberger's and Mr. Hanson's ability to purchase alcoholic beverages before the attack but further explained that Mr. Goldberger did not purchase any on the day of the attack and that Mr. Hanson purchased only one drink (a frozen margarita) on

the day of the attack on Mr. Carideo. [ECF No. 84-2, p. 17].

## Applicable Legal Standards & Analysis

Summary judgment is appropriate when the pleadings, depositions, affidavits and exhibits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen*, 121 F.3d at 646. On a motion for summary judgment, the court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party and determine whether the evidence could reasonably sustain a jury verdict for the non-movant. *Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.

To properly plead and establish a negligence claim, a plaintiff must allege and prove four elements: "a legal duty on the defendant to protect the plaintiff from particular injuries; (2) the defendant's breach of that duty; (3) the plaintiff's injury being actually and proximately caused by the breach; and (4) the plaintiff suffering actual harm from the injury." *Belik v. Carlson Travel Grp., Inc.*, 864 F. Supp. 2d 1302, 1308 (S.D.

Fla. 2011) (internal quotation and citation omitted).

<u>A Comment About Local Rule 56.1</u>

Local Rule 56.1 requires, in subsection (a), that both the movant and opponent accompany the summary judgment motion and the opposition with "a statement of material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively." S.D. Fla. L.R. 56.1(a). It requires the statement of material facts submitted in opposition to the summary judgment motion to correspond with the order and paragraph numbering scheme used by the movant.

Subsection (a) then provides that the "[a]dditional facts which the party opposing summary judgment contends are material shall be numbered and placed at the end of the opposing party's statement of material facts[.]" S.D. Fla. L.R. 56.1(a). It also explains that "the movant shall use that numbering scheme if those additional facts are addressed in the [optional] reply." S.D. Fla. L.R. 56.1(a).

Subsection (b) of the local rule is entitled "Effect of Failure to Controvert Statement of Undisputed Facts." S.D. Fla. L.R. 56.1(b). It provides that "all material facts set forth in the **movant's** statement filed and supported as required above will be <u>deemed admitted</u> unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." S.D. Fla. L.R. 56.1(b) (emphasis supplied).

The local rule does not, however, provide similar "deemed admitted" consequences if the moving party does not controvert the additional facts submitted by the party opposing summary judgment.

In the instant case, Mr. Carideo submitted 38 "additional facts" (designated A through KK) in his response. But Carnival did not directly controvert any specific additional fact listed by Mr. Carideo, nor did it use his "numbering scheme" when addressing those additional facts. Instead, it merely says, in a wholly conclusory fashion, that "Plaintiff presents no new facts in its 'Statement of Additional Material Facts not in Dispute' to prevent summary judgment in this matter." [ECF No. 86, p. 3].

Because the local rule does not have an automatic "deemed admitted" result if the opponent's additional facts are not controverted in the manner required by the rule, the Undersigned will not consider all 38 additional facts admitted. Instead, I will, when required for discussion of a particular point, evaluate a specific additional fact and determine whether there is supporting evidence in the record.

Mr. Carideo's additional fact II alleges that "Carnival Security Officer Rodrigues admitted that Mr. Goldberger, one of the assailants, **was** under the strong influence of alcohol, as manifested by strong alcohol breath." [ECF No. 84, p. 10 (emphasis added)]. As support, Mr. Carideo references a page of Rodrigues' deposition transcript. But that page, p. 62,[4] does not contain that supposed admission. [ECF No. 78-2, p. 17]. Instead,

[4]      Page 62 refers to the page number identified in the deposition transcript.

Officer Rodrigues simply said that he *read* about that. And he also testified that he did not have knowledge of any guest being intoxicated (as opposed to being engaged in drinking) on the cruise. [ECF No. 78-2, p. 16]. Carnival's response to a request for admission explained only that Carnival's security officers *suspected* that Goldberger was intoxicated.

*   *   *

Carnival owes its passengers a duty of "reasonable care under the circumstances[.]" *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959) (holding that "the owner of a ship in navigable waters owes to all who are on board . . . the duty of exercising reasonable care under the circumstances of each case."). The "reasonable care under the circumstances" standard "requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice **of the risk-creating condition**[.]" *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989) (emphasis added).

Mr. Carideo contends that Carnival had actual or constructive knowledge or notice of a risk-creating condition -- that comparatively youthful passengers on a Groove Cruise serving large amounts of alcohol become volatile, aggressive, and physically hostile and generate a risk of assault. He emphasizes the records

---

However, when citing to depositions throughout this Order, the Court has cited to the CM/ECF page numbers for the filed deposition transcripts. [*Cf.* ECF No. 78-2, p. 62 (transcript page number) *with* p. 17 (the CM/ECF page number)].

demonstrating five assaults on Carnival ships during the preceding three years. He relies upon the opinion testimony of his two experts, and he also notes that, in another recent case, a Carnival security officer explained about repeated requests for additional security guards to work on the ships.[5]

He stresses that this is a lawsuit involving a special type of cruise. Thus, he argues that "in addition to the customary alcoholic beverage package which Carnival sells to its passengers, there were additional full bottle sales for the club atmosphere." [ECF No. 84, p. 12]. Therefore, Mr. Carideo next argues, "Carnival also knew, or should have known that the passengers attracted to this floating electronic music festival would drink more and sleep less than Carnival's customary demographic." [ECF No. 84, p. 12].

To bolster his argument, Mr. Carideo also emphasizes that Carnival knew its passengers' cell phones would not function at sea to permit communication, such as accessing 911 emergency responders, as they would be able to do on land.

---

[5]     Specifically, Mr. Carideo's response refers to testimony by Michael Panariello, Carnival's Director of Security, in *Horne v. Carnival Cruise Lines*, No. 15-21031, 2016 WL 4808791, at *2 (S.D. Fla. Jan. 25, 2016) that "Carnival ship security officers had requested more security people and manpower onboard their vessels and had made repeated demands for additional security personnel in his budget requests." [ECF No. 84, p. 22]. In *Horne*, the District Court denied Carnival's summary judgment motion concerning the plaintiff's claim that she was sexually assaulted in her room and noted that Mr. Panariello said "I wish I could have one person patrol one deck." *Horne*, 2016 WL 4808791, at *2.

The Undersigned notes that the same law firm and attorneys representing Carnival in *Horne* also represent Carnival in this case.

And he also contends that Carnival did not need to know that these specific assailants would attack him. Rather, his claim for negligent security is based on "a lack of preparation for and deterrence of attacks in general." [ECF No. 84, p. 13].

Mr. Carideo makes the following points: (1) Carnival "operates a fleet of floating hotels[6] littered with numerous bars peddling alcohol to vacationing young adults whose very purpose is to 'let loose;'" (2) the Groove Cruise was "wetter, looser, and younger than most," and (3) a jury should be permitted to assess "whether the attack on the Plaintiff was reasonably foreseeable and whether Carnival should have taken more steps to deter such an attack." [ECF No. 84, p. 24].

At bottom, the parties agree on the fundamental legal principle that Carnival is liable to Mr. Carideo only if it had actual or constructive knowledge of the risk of assault or attack from fellow passengers aboard this type of theme cruise.

Carnival argues that Mr. Carideo is incorrectly trying to convert it, a cruise ship operator, into his insurer by imposing liability in the absence of any evidence of either type of knowledge. And Carnival says that it is unreasonable to expect it to do more than it did for security. In that regard, it notes that plaintiffs would never be satisfied with a cruise ship operator's security staffing decisions. Thus, it argues, "[i]f Carnival had 17 security personnel on the subject Groove Cruise (as it did) [cite omitted], then it

---

[6]     *Cf. Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1239 (11th Cir. 2014) (describing vessels as "state-of-the-art cruise ships that house thousands of people and operate as floating cities[.]").

should have had 20. If Carnival had 20, then it should have had 25. Carnival should place security officers on every deck, and so on and so forth." [ECF No. 86, p. 8].

Similar to the Court's reaction to an analogous defense argument in *Horne*, the Undersigned disagrees. As Judge Altonaga noted in *Horne* in connection with a lawsuit filed by a victim who was sexually assaulted during a cruise, "it would seem certain corrective actions, such as increasing the overall number of security guards to provide for a quicker or more effective response" or "assigning guards to patrol each of the cabin decks at night for potential noises or other signs of assault" could "help prevent or ameliorate most of the aforementioned assaults." 2016 WL 4808791, at *4.[7]

Carnival argues that the five prior attacks are not sufficiently similar to put it on notice of the specific risk-creating condition that led to the attack on Mr. Carideo. In particular, Carnival contends that "completely unrelated and substantially dissimilar sexual assaults" are insufficient to establish knowledge of the applicable risk-creating condition: "the likelihood that a Groove Cruise passenger would be the victim of a violent physical assault by an unruly, intoxicated passenger due to the nature of this

---

[7]     The Court acknowledges that the *Horne* Court did not ultimately need to determine whether Carnival had actual or constructive knowledge of a risk-creating condition "because the factual submissions show Carnival had *actual* notice of Horne's assault" as soon as other passengers "called security to report the assault." *Id.* at *5 (emphasis in original). The security officers took 15 to 20 minutes to respond. Therefore, Horne had "raised a triable issue of fact as to whether Carnival was negligent in failing to properly respond after receiving actual notice of her distress." *Id.* Nevertheless, the Court deems the analysis in *Horne* about actual or constructive knowledge to be helpful and persuasive.

specific charter cruise[.]" [ECF No. 86, p. 4]. Carnival says that a "generalized risk that crime could occur" aboard the ship is inadequate to establish notice. [ECF No. 86, p. 4].

To support its position, Carnival notes that Plaintiff's document request sought (after an agreed modification that led to the cancellation of a discovery hearing and an agreed order implementing the parties' agreement),[8] discovery of only prior incidents "**similar** in nature to that alleged in the Complaint and involving any passenger being physically assaulted or attacked **by another passenger during any other <u>Groove Cruise events</u>** chartered by Whet Travel for the three-year period preceding the subject incident." [ECF No. 86, p. 4 (quoting ECF No. 44, ¶ 6) (emphasis added)]. Based on this narrowed request, Carnival confirmed that there were *none.*

Therefore, Carnival argues that Plaintiff's evidence is only for *general*-type assaults on Carnival vessels, not evidence pinpointing similar passenger-on-passenger attacks or assaults during alcohol-focused theme cruises.

But Carnival raised a somewhat similar argument in *Horne,* and the Court rejected it. Specifically, Carnival argued there that the 59 prior passenger assault allegations involved "a variety of different features" from the assault on Horne. 2016 WL 4808791, at *4. The Court held that "the fact that not all sexual assaults are identical, as some occur between intimate partners while others are perpetrated by unknown

---

[8]     *See* ECF Nos. 42, 44.

assailants, is insufficient to render Carnival's knowledge unduly vague." *Id.*[9]

The Court acknowledges that the evidence of knowledge and notice was more on-point in *Horne* than here and that the actual order denying Carnival's summary judgment motion was technically based on evidence of actual knowledge and a related negligence claim of failure to timely respond. To an extent, Plaintiff is seeking to rely on general evidence concerning attacks and assaults aboard Carnival's ships. But he is *also* focusing on the **specific characteristics** of this particular cruise, which he says was "guaranteed to be even more alcohol soaked than the typical vacation cruise because it was limited to passengers over the age of 21, and involved three days and nights of almost uninterrupted drinking and electronic music provided by 70 DJs." [ECF No. 84, p. 16].

Implicitly acknowledging that the prior assaults are not identical, Plaintiff relies, at least in part, on general, common law principles of law concerning negligent security cases and opinions that "focus upon the particular circumstances of the premises

---

[9]     Here, Carnival also relies on *Burdeaux v. Royal Caribbean Cruises, Ltd.*, No. 11-22798, 2012 WL 3202948 (S.D. Fla. Aug. 3, 2012), *aff'd* 562 F. App'x. 932 (11th Cir. 2012), to establish that it did not have notice of the specific-risk creating condition that led to Plaintiff's assault. [ECF No. 86, pp. 3-4]. Carnival also brought up *Burdeaux* in *Horne* but Judge Altonaga concluded that the case "failed to persuade." *Horne*, 2016 WL 4808791, at *4. *Burdeaux* is helpful to Carnival here, but it is not dispositive because of the other factors discussed in this Order, including significant facts about the alcohol-oriented theme of the cruise, with its constant partying and round-the-clock loud music, and expert opinion testimony about the foreseeability of an attack on this ship, as opposed to a sexual assault in the downtown shopping area of Cozumel, Mexico, the scenario at issue in *Burdeaux*.

involved, such as taverns and hotels. " [ECF No. 84, p. 16].

Mr. Carideo emphasizes that the Eleventh Circuit recently acknowledged the application of common-law principles in maritime law. *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1232-33 (11th Cir. 2014) (noting that the Supreme Court has explained that Congress has largely left to the Supreme Court "the responsibility for fashioning the controlling rules of admiralty law" and further noting that the Supreme Court "authorized and directed the lower federal courts to shape" general maritime law) (internal quotations omitted); *see also Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 259 (1979) ("Admiralty law is judge-made law to a great extent[.]") (internal citations omitted). Given this procedural history, federal courts "enjoy considerable latitude in maritime cases because, under the constitutional grant, the '[b]oundaries' of maritime law generally 'were to be determined in the exercise of the judicial power.'" *Franza*, 772 F.3d at 1232 (quoting *The Thomas Barlum*, 293 U.S. 21, 43 (1934)).

*Franza*'s comments about judge-made law applying to maritime tort cases echoes language the Eleventh Circuit used two years earlier in *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012), where the Court held that "in analyzing a maritime tort case, we rely on **general principles of negligence law**." (internal quotation omitted) (emphasis added). Carnival and Plaintiff both agree that general principles of negligence law determine whether a shipowner complied with its duty to provide

reasonable care under the circumstances to its passengers.

Likewise, both parties agree that case law involving negligent security cases can inform the Court's analysis here, **even if those opinions involve attacks on land**, rather than aboard a ship. Carnival, for example, cites *Ho v. Hertz Corp.*, No. 09-20724, 2010 WL 2943489 (S.D. Fla. July 26, 2010) for the principle that criminal attacks were reasonably foreseeable where a business was located in a "high-crime" area. [ECF No. 78, p. 7].

Some general principles of negligence law can be found in the Restatement (Second) of Torts, which both parties rely upon in their submissions.[10] Section 344, relied upon by Mr. Carideo, is entitled "Business Premises Open to Public: Acts of Third Persons or Animals." It provides:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>
> (a) discover that such acts are being done or are likely to be done, or
> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

Restatement (Second) of Torts § 344.

Plaintiff also relies on Comment f. to Section 344, which provides:

> Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that

---

[10] Carnival cites Section 448 in its summary judgment motion. [ECF No. 78, p. 7].

there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. *If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.*

Restatement (Second) of Torts Section 344 (comment f).

Relying on this comment, which he argues is a "well noted exception to the general rule, Plaintiff underscores the special type of cruise involved here. He contends that Carnival **was** on notice of a specific risk-creating condition because it "conceived of, or at least contracted for, this precise type of cruise." [ECF No. 84, p. 21]. Therefore, he argues, "Carnival is well aware that the mixture of youth and alcohol is a risk creating condition." [ECF No. 84, p. 21]. According to Plaintiff, combining this risk with the "strong evidence that the assailants were intoxicated" is sufficient to permit his case to avoid a defense summary judgment on the issue of Carnival's knowledge of a specific risk-creating condition. [ECF No. 84, p. 21].

More specifically (and perhaps more dramatically), Plaintiff takes the position that "it is astounding that Carnival claims that it had no notice that the volatile mixture of young adult males, excessive alcohol and drug use, and three days and nights of electronic music did not make it foreseeable that physical altercations would occur." [ECF No. 84, p. 22].

To amplify and strengthen this argument, which seems to be a different way of

establishing foreseeability and constructive notice besides evidence of prior substantially similar incidents,[11] Mr. Carideo cites *Meyers v. Ramada Hotel Operating Company, Inc.*, 833 F.2d 1521, 1523 (11th Cir. 1987) for the principle that "the very fact Carnival has a security force (albeit insufficient) is *some* evidence of notice." [ECF No. 84, pp. 18, 22].

In *Meyers*, the Eleventh Circuit reversed a summary judgment order in favor of the defendant hotel in a lawsuit filed by a hotel guest who was raped in her room. 833 F.2d at 1523. The "sole issue in the case was whether the plaintiff had raised a genuine issue of material fact as to the foreseeability of the attack." *Id.* The appellate court held that a jury trial was necessary. *Id.* at 1524. In doing so, the Eleventh Circuit noted that "the landowner's provision of security services may itself serve as evidence of foreseeability of harm." *Id.* (internal citation omitted).

In the instant case, both Carnival <u>and</u> Whet Travel provided security, a factor that a jury might conclude is some evidence of Carnival's foreseeability of the risks inherently associated with the Groove Cruise.

Although the decision is admittedly a close one here, Mr. Carideo should be

---

[11]     As outlined by the Court in *Cosmos v. Carnival Corp.*, 272 F. Supp. 3d 1336, 1341 (S.D. Fla. 2017), "'evidence of substantially similar accidents is but one of the ways a plaintiff may prove a defendant's constructive notice of a defective condition'; it is certainly not the only way." (quoting *Thomas v. NCL (Bahamas), Ltd.*, 203 F. Supp. 3d 1189, 1192–93 (S.D. Fla. 2016) (citing *Jones v. Otis Elevator Co.*, 861 F.2d 655, 661–62 (11th Cir. 1988) ("We have held that evidence of similar accidents *might be* relevant to the defendant's notice[.]") (internal quotation omitted) (emphasis added))."

permitted to try to submit sufficient evidence at trial for a jury to determine whether Carnival had knowledge or constructive knowledge of a risk-taking condition and whether Carnival's negligence (assuming a jury finds Carnival negligent) was a proximate cause of Mr. Carideo's harm. *See generally Horne,* 2016 WL 4808791, at *4;[12] *see also Doe v. NCL (Bahamas) Ltd.,* No. 11-22230, 2012 WL 5512347, at *6 (S.D. Fla. Nov. 14, 2012) (denying cruise ship operator's partial summary judgment motion in case involving an alleged passenger-on-passenger sexual assault and noting that "the issue foreseeability is ordinarily a jury question where there is sufficient evidence of foreseeability to preclude a determination of the issue as a matter of law.") (internal citation omitted).[13]

---

[12]    As summarized in *Horne*, 2016 WL 4808791, at *5, when rejecting Carnival's proximate-cause argument, a defendant's breach proximately causes a plaintiff's harm when it is "a substantial factor in bringing about the harm." *In re Royal Caribbean Cruises Ltd.,* 991 F. Supp. 2d 1171, 1183 (S.D. Fla. 2013) (internal quotation omitted).

Carnival's failure to have more security on this type of cruise "may have been a substantial factor" in allowing the two passengers to attack Mr. Carideo and, "at the very least," Plaintiff has raised genuine issues of material fact concerning the issue of whether Carnival's alleged breaches of duty proximately caused Plaintiff's injuries. *Horne,* 2016 WL 4808791, at *5.

[13]    The *Doe* Court noted that a finding of negligence is "determined on a case-by-case basis" and explained that "when the danger is a criminal act carried out by a non-crewmember, a party will be liable in negligence for intervening criminal acts only if the acts were foreseeable." 2012 WL 5512347, at *6 (internal citations omitted); *cf. Chaparro v. Carnival Corp.,* 693 F.3d 1333, 1338 (11th Cir. 2012) (reversing order granting cruise ship operator's motion to dismiss negligence lawsuit by parents of cruise ship passenger fatally shot at a port of call and rejecting argument, at least at initial pleadings stage, that shooting death was unforeseeable).

To be sure, Plaintiff's evidence of knowledge of prior similar incidents is not strong, given that the fleet-wide number for the previous three years is comparatively modest (i.e., five assaults, compared to the 59 assaults in *Horne*) and is more general than specific. Nevertheless, given the expert witness testimony and the specific type of adult-only, party-oriented, alcohol-dispensing cruise, the Court concludes that the better course is to permit a jury to assess the issues (assuming that Mr. Carideo gets past a motion for judgment as a matter of law and submits his case to a jury).

The Undersigned's conclusion that Mr. Carideo has mustered enough evidence (albeit barely) of constructive notice to avoid a defense summary judgment is also supported by the logical consequences of Carnival's arguments, as outlined in the following hypothetical scenario:

Assume that Carnival sponsored a "**Booze** Cruise," as opposed to a "Groove Cruise," where all passengers were given an entire bottle of liquor each day and where dozens of DJs were pounding out loud heavy metal music around the clock and where passengers could participate in amateur boxing matches on a deck specially set up to host these sponsored fights. Assume further that any passenger could, upon request, receive a second (and even a third or fourth) bottle of liquor, and further assume that Carnival had *no* security officers on the cruise. Assume that on the **very first** Booze Cruise a passenger was mauled by another drunken passenger after the two had boxed each other in a cruise-sponsored fight, causing the victim to become a quadriplegic.

Because this cruise was the *first* Booze Cruise, there was no prior history of "similar" attacks -- only of other types of garden variety assaults and attacks perpetrated by passengers aboard a more-traditional cruise. Finally, assume that the hypothetical plaintiff had retained qualified expert witnesses who provided permissible opinion testimony that the smorgasbord of factors outlined above generated constructive knowledge of the specific risk and rendered the attack foreseeable.

Given Carnival's legal argument here, it would be compelled to also argue that it could not be liable in the hypothetical outlined above and that it would be entitled to summary judgment. Its argument would necessarily be that there is no evidence of similar assaults, as the attack and resulting injuries occurred on the *first* Booze Cruise and the other, prior attacks would be too general to support constructive notice.

But this hypothetical result of a definite summary judgment in defendant's favor with no opportunity for the quadriplegic plaintiff to have a jury assess the cruise operator's constructive knowledge of a risk of a drunken fight aboard the Booze Cruise would be problematic, at least in my view, and would arguably run afoul of the principle that the **character of the cruise itself** could be sufficient to provide the requisite knowledge. *See generally Meyers*, 833 F.3d at 1523 ("[e]vidence relevant to foreseeability includes the general likelihood of harm to the invitee, criminal activity in the vicinity and security measures taken by the owner of the premises.") (internal citations omitted); *Fernandez v. Miami Jai-Alai, Inc.*, 386 So. 2d 4, 6 (Fla. 3d DCA 1980)

(reversing order dismissing with prejudice complaint by patron against jai-alia club and parking lot concession for injuries sustained when patron was assaulted and stabbed while watching jai-alai games from the parking lot, noting that the case was not one involving the "unpredictable behavior of a third party" and explaining that a business owner "does have a duty to protect [his patrons] from those crimes which may be shown to be reasonably foreseeable and which may be shown to result in foreseeable risks"); *cf. Sabaelli v. Omni Int'l Hotels, Inc.*, 379 So. 2d 444, 445 (Fla. 3d DCA 1980) (reversing summary judgment for defendant hotel in lawsuit brought by a hotel bar patron who was unexpectedly and without provocation attacked by a drunk patron who smashed a highball glass into her face).

In addition, the defense-favoring result in the hypothetical is also inconsistent with one of the illustrations provided in the Restatement (Second) of Torts. Illustration 2 to Comment f. of Section 344 says:

> The A Railway Company, knowing that the students of a local college intend to welcome its victorious football team at the railway station, and knowing from previous experience of the **boisterous <u>character</u>** of such occasions, fails to assemble a sufficient number of its employees upon the platform to control the students. The students, in joke, hustle and injure B, a passenger who is awaiting his train. The A company is subject to liability to B.

Restatement (Second) of Torts Section 344 (comment f) (emphasis added).

Depending on how the evidence at trial unfolds, Carnival may revisit its argument that Mr. Carideo did not introduce sufficient evidence of knowledge or

constructive knowledge of the specific risk here. But it would be inappropriate to **summarily** resolve the issue now and prevent Mr. Carideo from presenting what is typically a jury issue to the jury, especially under the alcohol-focused nature of the Groove Cruise, the history of other assaults, the testimony that Carnival's chief security officer expressed a preference for a patrol on every deck, and the expert opinion testimony about foreseeability.

    **DONE AND ORDERED** in Chambers, in Miami, Florida, on March 23, 2018.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies Furnished to:**
All Counsel of Record